D.T., a minor, by his legally appointed guardians; M.T. and K.T. in their own behalf as parents and legal guardians of D.T.; F.H., Jr. a minor, by his legally appointed guardians; F.H. and L.T., in their own behalf as parents and legal guardians of F.H.; P.M., a minor, by his legally appointed guardian; R.T., in her own behalf as parent and legal guardian of P.M., Plaintiffs–Appellees,

v.

**INDEPENDENT SCHOOL DISTRICT NO. 16 OF PAWNEE COUNTY, OKLAHOMA, Defendant–Appellant.**

**Nos. 88–1619, 89–5037, and 89–5077.**

United States Court of Appeals, Tenth Circuit.

Jan. 25, 1990.

---

Frank A. Zeigler, Tulsa, Okl., for plaintiffs-appellees.

Edward J. Main (James K. Secrest, II on the briefs), of Secrest and Hill, Tulsa, Okl., for defendant-appellant.

Before LOGAN, BARRETT and EBEL, Circuit Judges.

BARRETT, Senior Circuit Judge.

This appeal arises out of a civil rights action brought by the plaintiffs-appellees, three male elementary students seeking damages from the defendant-appellant, Independent School District No. I-6 of Pawnee County, Oklahoma (School District) in connection with sexual acts committed against the plaintiffs by Stephen Lee Epps (Epps), a male teacher of School District, during summer vacation and in relation to fund raising for a summer basketball camp.

This 42 U.S.C. § 1983 action was predicated upon a complaint that the School District was guilty of deliberate indifference or that it acted with reckless disregard of plaintiffs' constitutionally protected liberty/privacy interests in the hiring, supervision and investigation of Epps who sexually molested plaintiffs. The complaint charged that the wrongful conduct of the defendants constituted "[a] violation of the plaintiffs' Federal Constitutional and statutory rights of privacy, liberty, substantive due process, equal protection and is a violation of their Fourth Amendment right to be secure in their person and other rights protected by the First, Fifth, Ninth

and Fourteenth Amendments to the United States Constitution...." (R., Supp. Vol. I, Tab 1, p. 8). Further, the complaint alleged that the hiring of Epps was the "moving force" behind the sexual abuse practiced by Epps upon plaintiffs and was, accordingly, state action taken under color of state law. Jurisdiction was predicated on 28 U.S.C. §§ 1331 and 1343(a)(3) and 42 U.S.C. § 1983.

The jury awarded damages of $42,000 each to D.T. and P.M. and $50,000 to F.H.

### General Background

Prior to the commencement of the 1981 school term, Epps, then some thirty years of age, was hired to teach fifth grade and also coach the boys' basketball team at Terlton Elementary School, Terlton, Oklahoma. The application-screening interview process was conducted by Dr. Charles Clayton, Superintendent of the Cleveland, Oklahoma, Public Schools. Mr. Donald K. Daniels, Principal at Terlton Elementary School, participated in the interview of Epps with Dr. Clayton. Principal Daniels recommended to Dr. Clayton that Epps be hired, and Dr. Clayton made that same recommendation to the School District Board. For purposes of this litigation, Dr. Clayton and Principal Daniels were considered policy making officials representing the defendant-appellant School District.

In 1971, Epps had been, unbeknownst to Dr. Clayton or Principal Daniels, convicted of sodomy in Dallas County, Texas. His criminal file was maintained under the name of Steve Epps. Epps was on probation when hired to teach in 1972 at Houston Elementary School in Lancaster, Texas. He taught fourth and fifth grades there until 1977. When he was hired there, the school district did not make specific inquiry of Epps about a criminal record because, under Texas law, one could not hold a teaching certificate if he/she had a criminal record. The same was true in Oklahoma when Epps was hired in 1981.

Prior to the commencement of the school term in 1981 but after Epps had been hired, Dr. Clayton received a telephone call from Mrs. Diane Kelley, a cousin of Epps, from Phoenix, Arizona. Mrs. Kelley informed Dr. Clayton that Epps had visited her home in Phoenix that summer and had physically fondled her eleven-year-old son in his private parts.

Dr. Clayton considered the Kelley report as most serious. He proceeded to make a number of contacts and inquiries concerning Epps and requested that Principal Daniels make an investigation, including a personal confrontation with Epps concerning these charges. Principal Daniels did so, and Epps denied any wrongdoing. He claimed that Mrs. Kelley wanted him to remain in Phoenix at her home and that she made these charges because he did not stay with her.

During the fall of 1981, Principal Daniels was informed by two or three other individuals of similar rumors about Epps but no complaints had ever been lodged against Epps. Dr. Clayton requested that Principal Daniels keep close track of Epps. There were no additional rumors or reports of any kind adverse to Epps following those made in the fall of 1981. The incident between Epps and the three minor male plaintiffs occurred on June 13–14, 1984, when the three plaintiffs, each members of Epps' fifth grade class, went with Epps to Sand Springs and Tulsa, Oklahoma, to sell candy to raise money for summer basketball camp "scholarships" and stayed overnight at Epps' home.

### Undisputed Facts
(Relative to the School District's Policy of Hiring and Supervising Teachers)

Dr. Clayton accepted applications for a position of fifth grade teacher and boys' basketball coach at the Terlton Elementary School, during the summer of 1981 for a contract term from August, 1981, to the end of May, 1982. (R., Supp. Vol. II, pp. 74–75). The application and selection process followed by Dr. Clayton was the normal, accepted procedure used in the State of Oklahoma (R., Supp. Vol. II, pp. 160–64). The first step in the procedure was that of notifying four or five universities or colleges in Oklahoma of the vacancy and ad-

vising that applications would be accepted and screened (R., Supp. Vol. II, p. 74).

One of the applications received was from Epps who was then the Superintendent of Schools of Wann, Oklahoma. *Id.* The application form used in this case (just as all such forms in Oklahoma) did not contain any place thereon for reference to an arrest or criminal record because a teacher with a felony record cannot obtain or retain a teaching certificate from the State of Oklahoma. (*Id.* at 76; R., Supp. Vol. III, p. 1640; R. Supp. Vol. IV, p. 445). It was the policy of the school district, however, to ask "support" personnel whether they have been arrested. (R., Supp. Vol. III, p. 111). In the case of teachers, the school district relied on the certification process. *Id.*

The certificate relative to the Epps application, just as the certificates for all other applicants, came to Dr. Clayton from Oklahoma State University and contained confidential, complete information about the applicant's educational background, academic honors, and professional standing (R., Supp. Vol. II, p. 80). In addition, Dr. Clayton received from Oklahoma State University recommendations from college professors and principals-superintendents where Epps had taught or worked. *Id.* at 81. Dr. Clayton, prior to conducting the personal interview with Epps, conducted telephone interviews with those listed as recommenders. *Id.* at 81, 114. Both the certificate and recommendations were returned to Oklahoma State University following the personal interview of Epps conducted by Dr. Clayton and Principal Daniels. *Id.* at 82. The interview with Epps was conducted during the month of May, 1981, and lasted about one hour (R., Supp. Vol. III, p. 108). At the conclusion of the interview, Principal Daniels recommended to Dr. Clayton that Epps be hired. (R., Supp. Vol. IV, p. 444).

Dr. Clayton, who had served as Superintendent of the Cleveland Public Schools since 1979, and who supervises the entire educational program for the Cleveland schools, including principals (R., Supp. Vol. II, p. 73), recommended to the school board that Epps be hired as the fifth grade teacher and coach of boys' basketball at Terlton Elementary School for the school year September 1, 1981, to June 1, 1982 (R., Supp. Vol. III, pp. 104, 168–69). Terlton, Oklahoma, is a small town with a population not exceeding 300 persons. (R., Supp. Vol. V, p. 567).

A person convicted of a felony in Oklahoma cannot have a teaching certificate. (R., Supp. Vol. III, p. 164) (testimony of Dr. Clayton); (R., Supp. Vol. IV, p. 445) (testimony of Principal Daniels). Martin Allen Brown, a private investigator employed by the plaintiffs, testified that in checking the court records of Dallas County, he was only able to locate the Epps "sodomy case" file by using a computer and referencing to the name "S" Epps which directed him to a 1971 conviction of one *Steve Epps.* (R., Supp. Vol. III, pp. 197–99). He agreed that if the name Stephen Lee Epps had been used in the computer search that it would not have shown the conviction. *Id.* at 213. Furthermore, in 1981, there was no computer system available to conduct such an inquiry and it would have been a matter of diligence and competency of any person working in the clerk of court's office to equate the file of Steve Epps to Stephen Lee Epps. *Id.* at 208–09.

On or about August 11, 1981, Mrs. Diane Kelley of Phoenix, Arizona, mother of three minor children, phoned Dr. Clayton at his office in Cleveland, Oklahoma (R., Supp. Vol. II, p. 42, 116). Mrs. Kelley related that Epps, her cousin, had recently visited at her home in Phoenix and that Epps had physically fondled her eleven year old son in his private parts and that she was very afraid of the situation because she learned that Epps was to teach in Oklahoma. (R., Supp., Vol. II, p. 42, 55; R., Supp. Vol. III, p. 116). Dr. Clayton's notes indicate that Mrs. Kelley may have referred to Epps as a child molester. Dr. Clayton treated Mrs. Kelley's inquiry as most serious, (R., Supp. Vol. III, p. 124), because in the course of his more than 30 years in the educational system, he had never experienced a teacher who was a child molester. *Id.* at 127. Dr. Clayton informed Mrs. Kelley that he would get in

touch with Epps' principal and conduct a full investigation, (R., Supp. Vol. II, p. 45).

Following the call from Mrs. Kelley, Dr. Clayton first contacted Principal Daniels and asked him to make personal contact with Epps concerning the Diane Kelley allegations. (R., Supp. Vol. III, p. 112; R. Supp. Vol. IV, p. 360). Principal Daniels had been in the school system for some 35 years and had observed abused or sexually abused children. *Id.* at 366. Principal Daniels did confront Epps with the allegations made by Mrs. Kelley and spoke with him at length about the matter. Epps denied touching Mrs. Kelley's child, absolutely denied that he was a homosexual and claimed that the reason Mrs. Kelley made the call and leveled the charges was because she was mad that he left Arizona. Epps claimed that Mrs. Kelley wanted him to stay with her and not to return to Oklahoma. *Id.* at 377, 378. Principal Daniels considered that to be a plausible explanation and was personally convinced that Epps would not harm children. *Id.* at 379, 381.

Dr. Clayton testified that he also pursued the following inquiries in order to check out the serious allegations made by Mrs. Kelley:

(1) He phoned Larry Ferguson of Cleveland, Oklahoma, who was then serving as president of the board of education and notified him of the call received from Mrs. Kelley (R., Supp. Vol. III, pp. 116–17). Ferguson related that it would be necessary to "double check" the places of Epps' prior employment but that he was not too concerned because Epps was then dating a female teacher in Cleveland (R., Supp. Vol. IV, pp. 562–63).

(2) Dr. Clayton phoned Ben Lacy, principal of Drumright, Oklahoma, School (R., Supp. Vol. III, p. 120). He had already received good reports from Lacy relative to Epps' work at Drumright during the interview screening process. *Id.* at p. 168. When Dr. Clayton advised Lacy of Mrs. Kelley's charges, Lacy stated that he had heard rumors about Epps concerning child abuse and that one board member, Peggy Pruitt, had informed him that she had heard rumors to the effect that Epps was a homosexual. *Id.* at 147.

(3) Dr. Clayton next phoned Glenn Thompson Jones, of Lancaster, Texas, Principal of Houston Elementary School where Epps served as a fourth and fifth grade teacher from August, 1972, to June of 1977 (R., Supp. Vol. III, pp. 120–21; R., Supp. Vol. IV, p. 495). Dr. Clayton related the information received from Mrs. Kelley to Jones including the report that Epps had been fired there. Jones related that he had no knowledge of a sexual molestation or abuse of children incident involving Epps before Epps was hired at Houston Elementary School, and that he knew of no incident involving Epps and young children during the five years Epps taught at Lancaster. (R., Vol. IV, pp. 496–97). Jones informed Dr. Clayton that Epps did a good job there, that he would hire Epps back if he applied for a job and that Epps left on his own (R., Supp. Vol. III, p. 121; R., Supp. Vol. V, pp. 496–97). Principal Daniels also phoned Jones and he, too, was told that Epps had not been fired from his teaching job at Lancaster and that he could have retained his job if he had desired. (R., Supp. Vol. III, p. 384).

(4) Dr. Clayton also phoned the Wann, Oklahoma, elementary school and again obtained a very favorable report and recommendation concerning Epps. (R., Supp. Vol. III, pp. 167–68).

With the report from Principal Daniels concerning his conference with Epps and the lack of any credible evidence of acts of child molestation or homosexuality on the part of Epps, Dr. Clayton believed that he had done everything reasonable to investigate the matter under the circumstances (R., Supp. Vol. III, p. 124). Dr. Clayton requested that Principal Daniels watch Epps closely (R., Supp. Vol. IV, p. 360).

Principal Daniels testified that he did watch Epps closely, by spontaneous visits to his classroom, going to basketball practices and games, and seeing Epps every school day. *Id.* However, he never observed Epps touching young school boys in any unusual manner. *Id.* at 362. Principal Daniels wrote six formal evaluations of

Epps' performance as a teacher at Terlton Elementary School from 1981 until 1984 (three school years) and placed Epps in the highest category. *Id.* at 362–65. He testified that he heard no rumors about Epps beyond those that he had heard in 1981 and could find no basis to support them. *Id.* at 376.

Principal Daniels also testified that he was contacted by Mrs. Charlotte Johnson during the fall of 1981 and that she told him about rumors that Epps was homosexual and that she indicated a concern that he would harm children. (R., Supp. Vol. III, p. 216; R., Supp. Vol. IV, p. 370). Mrs. Johnson did not know of any incidents involving Epps. *Id.* at 371. Principal Daniels told Mrs. Johnson about a week later that he couldn't find any evidence on Epps (R., Supp. Vol. III, p. 217). Principal Daniels testified that he took such rumors seriously and in his opinion the only thing more serious would be murder. (R., Supp. Vol. IV. p. 387). This rumor was relayed to Dr. Clayton by Principal Daniels (R., Supp. Vol. III, p. 149). Principal Daniels testified that the "rumors" concerning Epps died down because there were no incidents during the three school years he taught at Terlton. (R., Supp. Vol. IV, p. 392).

When Mrs. Kelley phoned Dr. Clayton during the spring of 1982, he informed her that Epps was getting along fine, that "we" had no problems with him and that Epps was dating a female teacher (R., Supp. Vol. III, p. 126). Dr. Clayton testified that he "probably" concluded that Mrs. Kelley was in error concerning any problem Epps may have had in Dallas, Texas. *Id.* at pp. 126–27. He testified that nobody made any references concerning any improprieties between Epps and young boys during the three years he taught at Terlton Elementary School (R., Supp. Vol. III, p. 114).

Walter C. Potts testified that he served as custodian of Terlton Elementary School and that in August, 1981, he told Principal Daniels that one of the school maintenance supervisors had seen Epps and remarked that Epps had been run out of Drumright "for fooling around with them little boys."

(R., Supp. Vol. III, pp. 192–93). Principal Daniels in turn related this rumor to Dr. Clayton who in turn checked the rumor out with Mr. Lacy, the principal, and other school officials at Drumright (R., Supp. Vol. IV, p. 371). Lacy informed Dr. Clayton that he had heard rumors about Epps but that no official complaints had been made (R., Supp. Vol. III, p. 147). Dr. Clayton conveyed the remarks by Lacy and rumors conveyed by Peggy Pruitt to the school board. *Id.* at 146–47.

Mrs. Debbie Hewitt, mother of Nathan Hewitt who was a student in Epps' class at Terlton Elementary School in 1981–82, was concerned about rumors that Epps wanted to "spend time with my son" and reported this to Principal Daniels who said he would check it out (R., Supp. Vol. IV, 352–54). She stated that on a follow-up visit, Principal Daniels stated that he could not find out anything. *Id.* at 355. Principal Daniels has no recollection of a visit with Mrs. Hewitt in May, 1982, concerning the rumor that Epps may be a pedophile. *Id.* at 358.

Dr. Clayton testified that the first information he had concerning Epps' conviction in Texas came in July, 1984, when Epps was charged in Oklahoma and that he had been told the Texas criminal record had been expunged. *Id.* at 78. In retrospect, Dr. Clayton acknowledged that it would have been advantageous had he been informed of Epps' criminal record. *Id.*

### Disputed Evidence
(Relative to the School District's Policy of Hiring and Supervising Teachers)

Mrs. Kelley testified that in addition to advising Dr. Clayton of Epps' fondling of her son, she also told Dr. Clayton that she had learned that Epps had been arrested in Dallas for a similar incident (R., Supp. Vol. II, p. 44). Mrs. Kelley also testified that she obtained Principal Daniels' name about two or three days after speaking with Dr. Clayton and that she repeated to Principal Daniels what she had told Dr. Clayton. *Id.* at 47. Mrs. Kelley testified that she asked Principal Daniels to call her back about the outcome of his investigation into the situation, but she called him instead and Princi-

pal Daniels stated to her that he had a personal conference with Epps, found that Epps was dating a female and that everything seemed to be all right. *Id.* at 48, 49, 60–61. Mrs. Kelley stated that she recalled informing Dr. Clayton that her family had related to her that Epps had been arrested in Texas. *Id.* at 58. She acknowledged that she was upset when she phoned Dr. Clayton and that she may have stated that she had been told that Epps was fired from his job in Texas for "being a child molester" as opposed to relating that he had been arrested. *Id.* at 59.

Dr. Clayton testified that when Mrs. Kelley phoned him on August 11, 1981, he treated her call as a serious inquiry both because of the allegation concerning Epps' fondling of her 11–year old son and also because she had related that her mother had informed her that Epps had been fired from the Dallas school. (R., Supp. Vol. III, pp. 116, 118) Dr. Clayton testified, however, that Mrs. Kelley definitely did not inform him that Epps had been arrested in Dallas. *Id.* at 118, 121. Dr. Clayton testified that if Mrs. Kelley had told him that Epps had been arrested, he would probably have contacted law enforcement officers (R., Supp. Vol. III, p. 185).

Principal Daniels testified that he did not at any time receive a call from Mrs. Diane Kelley, (R., Supp. Vol. IV, p. 358–59), and that Dr. Clayton advised him of the call received from Mrs. Kelley and of the allegation of sexual misconduct by Epps toward Mrs. Kelley's minor son and the report that Epps had been fired from a school in Texas. *Id.* at 358–59. He was never advised that Epps had been arrested in Dallas. *Id.*

Richard A. Lewis, a private investigator employed by the defendants, testified that he spoke by telephone with Mrs. Diane Kelley on May 6, 1987, and that she related that she had made two or three calls to Dr. Clayton, whom she referred to as the principal (R., Supp. Vol. IV, p. 534). Lewis had no recollection that Mrs. Kelley ever stated that Epps had ever been criminally charged. *Id.* at 549.

Mrs. K.T., mother of D.T., one of the Terlton Elementary School boys molested by Epps, testified that after the incident she and Mrs. L.H., mother of one of the plaintiffs, called upon Dr. Clayton and that he told them he was shocked about the incident and that Epps had been suspended and would not be in the school system any longer (R., Supp.Vol. III, p. 228) She testified that when she and Mrs. Baker returned to Dr. Clayton's office a few days later, he told them that they were troublemaking parents and that Principal Daniels was a good principal. *Id.* at 229. Dr. Clayton denied ever telling the mothers that they were troublemaking parents. *Id.* at 157. Dr. Clayton testified that when he learned of the child molestation incident involving Epps and three of his male students at Terlton Elementary School that he invited all of the mothers of the children to come to his office, which they did, and that he offered the school guidance center and advised them that he would meet with them again that week. *Id.* at 156–57. He did meet with them two days later. *Id.*

### Undisputed Evidence

(Relative to the Summer Basketball Camp and Solicitation of Funds for Attendance at the Camp)

Epps was hired to teach the fifth grade and be the boys' basketball coach at Terlton Elementary School commencing with the school year 1981. (R., Supp.Vol. III, p. 170). Epps was hired on a year-to-year basis commencing in late August to the end of May. *Id.* at 171. Epps had no duties or obligations under his contract as a teacher and coach after the school term ended in May until it commenced again in late August of each year (R., Vol. III, pp. 467–69). Epps received his checks for the summer months sometime toward the end of May each year when he completed his work (R., Supp.Vol. IV, pp. 402–03). Epps taught and coached at Terlton Elementary School for three years. *Id.* at pp. 357–58.

For some years prior to 1984, a short summer "basketball camp" had been held at Oklahoma State University for elementary grade school children, operated by per-

sons independent of regular school functions. (R., Supp.Vol. IV, pp. 395–96). During the summer of 1984, however, the basketball camp was operated and directed by Larry Warden (Coach Warden), who worked during the regular school term as the girls' basketball coach at the Cleveland schools. The camp was to be held the summer of 1984 at the Cleveland High School facilities. (R., Supp.Vol. III, pp. 179–81; R., Supp.Vol. IV, pp. 461–63). This function was approved by the school board on May 7, 1984 (R., Supp.Vol. III, p. 179) under arrangements with Coach Warden whereby he agreed to provide insurance and many other things (R., Supp.Vol. IV, pp. 462–63). There is nothing in the record demonstrating that the school district sponsored, organized or managed the basketball camp. Principal Daniels testified that there are various summer basketball camps throughout the State of Oklahoma which cost the participants various amounts of money and that they are voluntarily attended. *Id.* at 464.

A "notice" or "flier" concerning a basketball game to be played at the outdoor basketball court at Terlton Elementary School in May, 1984, was prepared by Coach Warden, and circulated to the students at the school. The circular announced that a game would be played between the parents and the children to raise money to send basketball players who could not afford the admission fee to the camp (R., Supp.Vol. IV, pp. 392–93; R., Supp.Vol. III, pp. 179–80). Principal Daniels explained that the Terlton Elementary School is a small school, that there is no newspaper in the community and that there are many activities where the primary notice is a bulletin concerning the volunteer fire department, water board meetings, Girl Scouts, etc., distributed to the children at school to take home to their parents (R., Supp.Vol. IV, pp. 392–94). Principal Daniels stated that because there were so few people in Terlton who subscribed to the Cleveland newspaper, in order to reach the majority of people in the community, distribution of notices through the school students was one avenue used. *Id.* The Terlton Elementary School building was used for various community activity meetings, such as volunteer fire department, summer basketball programs, Girl Scouts, Boy Scouts, and Brownies. *Id.*

The outdoor basketball game played at the Terlton Elementary School playground during one evening in May, 1984, was not organized, sponsored or promoted by the school. *Id.* at 464. Parents and other volunteers worked at concessions during the basketball game. *Id.* at 396. The school did not contribute any money to the game or to the summer basketball camp or to any student who wished to attend. *Id.* at 460–64. None of the proceeds from the game went to Terlton Elementary School. *Id.* at 460. Mrs. L.H. testified that she found out after this game that it was not sponsored by the school. (R., Supp.Vol. III, p. 266).

Another "flier" or "notice" prepared by Coach Warden was also distributed at Terlton Elementary School advising that a summer basketball camp would be held at Cleveland High School. *Id.* at 395. Larry Ferguson, former member of the Cleveland School Board, testified that the school board has never approved or sanctioned any activity to raise money for grade school children to attend summer basketball camp (R., Supp.Vol. III, p. 568).

Principal Daniels testified that he spoke with Epps on several occasions in 1983 and 1984 about activities involving raising money for the summer basketball camps and explained that the summer basketball camps could not be a school activity and whatever Epps did in that regard would be "as a volunteer in the community," (R., Supp.Vol. IV, p. 400), and that he would not be doing it as a school basketball coach. *Id.* Principal Daniels testified that he had no knowledge that Epps and the three plaintiffs were together to sell candy for basketball camp on June 13–14, 1984. *Id.* at 401.

On June 13, 1984, Epps took the three minor children, all members of the Terlton Elementary School basketball team, ages 11, 11 and 13 respectively, (R., Supp.Vol. III, p. 94), to Sand Springs and Tulsa, Oklahoma, to sell candy to raise money for the summer basketball camp. *Id.* at 236. The

three minor children had their parents' permission to go with Epps to sell the candy. *Id.* at 236, 282, 295. The three minor children also had permission from their parents to spend the night with Epps. Epps sexually abused each of the plaintiffs during the June 13–14, 1984, time period.

There is no relevant disputed evidence in the record relating to the summer basketball camp and solicitation of funds for attendance at the camp.

### Jury Verdict—Court Instructions—Interrogatories

The district court, early during the trial, observed that "[T]he issue in this case is whether there was a policy followed by the defendant which resulted in these acts being committed and allowing these acts to be committed. We are not trying a negligence case ... we are trying a 1983 case." (R., Supp.Vol. III, p. 139). Again, during trial, the court gave the following limiting instruction:

> This is a civil rights case rather than a negligence case. The plaintiffs claim that the defendant's actions deprived them of their constitutional rights. In order for a school district to be liable for depriving a person of his civil rights, it must have established an official policy which caused the deprivation. To constitute official policy the policy need not be in writing. However, the policy must be a deliberate choice of an employee of the school district and that employee must be responsible for establishing final policy with respect to the subject matter in question.

*Id.* at 188.

After the defendant moved for a directed verdict following the plaintiffs' case, counsel for the defendant argued that the evidence simply did not support the proposition that Dr. Clayton and/or Principal Daniels had displayed reckless disregard or deliberate indifference to the constitutional rights of the plaintiffs in the hiring of Epps (R., Supp.Vol. IV, pp. 419–23). Further, counsel for the defendant argued that even should *the court* find deliberate indifference in the hiring of Epps by the defen-

dant, still the plaintiffs must show that this was the "but for" leading to the molestation incidents of June 13–14, 1984. *Id.* at 422. Counsel for defendant argued that, as a matter of law, the acts committed by Epps on the plaintiffs on June 13–14, 1984, were not committed by an employee of the school district but rather as a private individual because Epps was not then acting for the defendant as a teacher or coach. *Id.* at 424.

The district court observed that it had come very close to sustaining a motion for summary judgment filed by defendants on the pleadings, but that the court was now satisfied that the policy issues should go to the jury, *id.* at 427, and that reasonable men could differ as to whether the investigation conducted by the school district was totally inadequate and could rise to the level of reckless disregard or deliberate indifference. *Id.* at 434. The motion for directed verdict was denied.

The motion for directed verdict was renewed by the defendant at the conclusion of all evidence and denied by the court (R., Supp.Vol. V, pp. 582–83). The court informed counsel that it was finding that the defendant was acting under color of some law of the State of Oklahoma and that the jury would be so instructed. *Id.* at 587. The court also informed counsel that an instruction would be given that "[t]he liberty of the individual which the federal Constitution thus secures and protects includes freedom from unjustified intrusions on personal security including physical injury." *Id.* at 588.

The district court, following closing arguments by counsel, instructed the jury, *inter alia,* that:

> Plaintiffs claim that the defendant school district implemented a policy concerning the hiring, supervision and investigation of complaints concerning teacher sexual misconduct which showed deliberate indifference to the plaintiffs' constitutional rights. As a result of the alleged deprivation, plaintiffs claim that they sustained physical, emotional and monetary damages.

The defendant denies that its actions showed a policy of deliberate indifference to the complaints of sexual misconduct by teachers, either in hiring of teachers or in supervision of teachers.

The plaintiff [sic] also denies that its actions were the cause of the plaintiffs' injuries and claims that plaintiffs' injuries were caused by the criminal acts of Stephen Lee Epps.

(R., Supp.Vol. VI, pp. 661–62).

Further, the district court instructed:

[P]laintiffs' cause of action ... against defendant is brought under Title 42, United States Code, Section 1983 which states: [recital of statute omitted]

In order to prove plaintiffs' claim the burden is upon the plaintiffs to establish by a preponderance of the evidence in the case the following facts:

First, that a policy making employee of the defendant, with responsibility for establishing final policy with respect to the subject matter in question, made a deliberate choice to follow a course of action, which through reckless disregard or deliberate indifference to the plaintiffs' rights, operated to deprive plaintiffs of one or more of plaintiffs' federal constitutional rights.

Second, that such defendant then and there acted under color of some law of the State of Oklahoma.

And third, that such policy was the moving force behind the constitutional deprivation and consequent damage to the plaintiffs.

*Id.* at pp. 667–68.

The district court further instructed the jury that the Fourteenth Amendment to the federal Constitution provides that no state shall deprive any person of his liberty without due process of law, and that this includes freedom from unjustified intrusions on personal security including physical injury. *Id.* at 669.

The court instructed that, as a matter of law, Dr. Clayton and Principal Daniels were acting under color of state law, *id.* at 670, and:

You are further instructed that you need not determine whether Stephen Lee Epps was acting under color of state law at the time of the criminal acts which occurred. The issue in this case is not whether Epps was acting as an official of the state, but whether there was a policy in existence of the defendant which constituted deliberate indifference to or reckless disregard for the rights of the plaintiffs and, if so, whether such policy was the moving force behind a constitutional deprivation. *Id.* at 670–71.

[Y]ou are instructed that the particular policy established by the defendant must be the moving force behind the constitutional violation and that plaintiffs must prove by a preponderance of the evidence that an affirmative link exists between that particular constitutional violation alleged and the policy.

*Id.* at 673.

Neither party lodged any objections to the instructions given.

In conjunction with the jury verdict awarding damages to the three plaintiffs, *supra,* the jury responded "yes" to each of the following special interrogatories:

(1) Did the plaintiffs prove by a preponderance of the evidence that Dr. Clayton was the policy making employee of the defendant with the responsibility for establishing final policy with respect to the hiring, investigation, and supervision of teachers at Terlton Elementary School? Yes.

(2) Did the plaintiffs by a preponderance of the evidence [prove] that Dr. Clayton made a deliberate choice to follow a course of action which constituted a policy of reckless disregard or deliberate indifference to plaintiffs' rights? Yes.

(3) Did plaintiffs prove by a preponderance of the evidence that Principal Daniels was a policy making employee of the defendant with responsibility for establishing final policy with respect to investigation and supervision of teachers at Terlton Elementary School? Yes.

(4) Did the plaintiffs prove by a preponderance of the evidence that Principal Daniels made a deliberate choice to fol-

low a course of action which constituted a policy of reckless disregard or deliberate indifference to plaintiffs' rights? Yes.

(5) Did the plaintiffs prove by a preponderance of the evidence that the policy of the defendant was the moving force behind the deprivation of plaintiffs' constitutional rights? Yes.

(R., Supp.Vol. VI, pp. 679–80).

### Contentions on Appeal

On appeal, the defendant contends that the judgment must be reversed because (1) there was no action taken "under color of law" required pursuant to 42 U.S.C. § 1983 because Epps was not acting under color of state law when he molested the plaintiffs, (2) the defendant School District may not be held liable because there was no "state action" involved when the plaintiffs were sexually molested by Epps, (3) the defendant School District did not have a policy of deliberate indifference or reckless disregard of the plaintiffs' rights, (4) any policy or custom adopted by the School District was not the moving force behind any deprivation of rights, (5) the plaintiffs were not deprived of a constitutionally protected right, and (6) the trial court erred in failing to direct a verdict for the School District.

### I.

■ Appellant School District contends that the events giving rise to this litigation are not events for which the School District should be held responsible under 42 U.S.C. § 1983, citing to *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976) for the proposition that a plaintiff must show (1) that he has been deprived of a right secured by the Constitution of the United States, and (2) that such deprivation was achieved under color of state law. School District cites *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941) wherein the Supreme Court defined action taken "under color of law" as "[m]isuse of power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." (Brief of Appel-

lant, p. 10). The School District reasons that there was no state action involved in the events of June 13–14, 1984, when Epps molested the plaintiffs. Instead, argues the School District, "In point of fact, those events were the product of a private individual acting in his private capacity in connection with a private activity that the plaintiffs voluntarily and freely participated in as private individuals." (Reply Brief of Appellant, No. 88–1619, p. 10). We agree.

42 U.S.C. § 1983 provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any state ... subjects or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

Acts of a state officer in the ambit of his personal pursuits are not acts under color of state law. *Screws v. United States*, 325 U.S. 91, 65 S.Ct. 1031, 89 L.Ed. 1495 (1945). A state, its agencies or officials may not be assessed liability for the acts of a private individual, except by a "fair attribution" of those actions to the State. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 936–37, 102 S.Ct. 2744, 2753–54, 73 L.Ed.2d 482 (1982). It is uncontested in our case that on June 13–14, 1984, Epps was under no obligation to the School District. He was then on his free or summer "vacation." As such, he had no duties or obligations owing to or functions to perform for the School District. His contract required only that he teach fifth grade and coach boys' basketball at Terlton Elementary School commencing late August and continuing to the end of May of each school year. Principal Daniels made it plain to Epps that any and all activities associated with summer basketball camps were not school related.

Beyond this, the thread connecting the School District to the 1984 summer basketball camp to be held at Cleveland High School under the sponsorship, control, and

management of Coach Warden, under a contract arrangement, was much too thin to constitute the basketball camp a sponsored activity of the School District. The only affirmative connections are to be found in: (a) the resolution adopted by the School District approving the use by Coach Warden of the Cleveland High School facilities for the conduct of the basketball camp, (b) the permitted distribution of fliers or notices concerning the summer camp among the school children attending Terlton Elementary School, and (c) the consented use of the outside basketball court by parents, children and others interested in raising funds for children who could not otherwise afford the cost of attending the summer basketball camps.

The above scenario involving the summer basketball camp constitutes the only possible nexus tying the School District to the off-duty, private action taken by Epps to organize the June 13–14, 1984, meeting with the plaintiffs to sell candy in order to raise money for the summer basketball camp. There is no argument that Epps was not under any obligation or duty to the School District during the "summer" vacation. No contention is made that the School District even knew that Epps and the plaintiffs planned the candy selling activities.

The obvious purpose of Congress in the enactment of § 1983 was to provide a remedy to parties deprived of constitutional rights by a state official's abuse of his position while acting under color of state law. The deprivation in the case at bar involved the sexual molestation actions practiced by Epps upon the plaintiffs June 13–14, 1984. It is a given that the School District cannot be liable to the plaintiffs for Epps' actions on a *respondeat superior* theory. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). That case provides that a municipality is liable for constitutional torts only if the alleged unconstitutional acts implement a policy, ordinance or custom of the local government. *Id.* at 694, 98 S.Ct. at 2037 ("[i]t is when execution of a government's policy or custom … inflicts

the injury that the government as an entity is responsible under § 1983.")

In *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976), the Supreme Court held that municipalities and their supervisory personnel are not liable for civil rights violations caused by individual police officers employed by the municipalities unless the plaintiff demonstrates "[a]n affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy—express or otherwise—*showing their authorization or approval of such misconduct." Id.* at 371, 96 S.Ct. at 604. (Emphasis supplied). In other words, it is the obligation of the plaintiff to prove that there exists a direct nexus between the constitutional torts (here the acts of sexual molestation practiced by Epps upon the plaintiffs on June 13–14, 1984) and the School District's authorization or approval thereof, either expressly or otherwise, by the adoption of any plan or policy. In the instant case, there is absolutely nothing in the record demonstrating that the School District had any control over Epps during the summer months. Epps had no duties or obligations to perform on behalf of the School District during the summer months. Further, the School District did not sponsor or approve the activities undertaken by Epps and the plaintiffs on June 13–14, 1984, i.e., to sell candy in order to raise money for attendance at the summer basketball camp.

The district court permitted the jury to treat the School District's procedure in hiring teachers as the "policy" which, if found to be so wanting in its investigative methods in Epps' case as to demonstrate reckless disregard or deliberate indifference to the plaintiffs' constitutional rights, to serve as the required "nexus." Thus, under the court's instructions, Dr. Clayton and Principal Daniels—and not Epps—were the "state actors" on June 13–14, 1984, and the issue for jury resolution was whether their conduct (and accordingly that of the School District) in the procedure employed in the investigation, hiring, and supervision of Epps as a teacher and coach at Terlton Elementary School was the affirmative link

required under *Rizzo v. Goode, supra.* We hold that the district court clearly erred in so instructing.

Epps was, on June 13–14, 1984, acting in a status similar to that of an "off duty" policeman, except that Epps was absolutely free from all obligation or duty to School District. Thus, the "nexus" is much more tenuous in this case than that of an "off duty" police officer. We reject plaintiffs' contention that the deprivations in this case are fairly attributable to state law because of the "cloak of authority" held by a teacher: "This authority is not limited to the classroom or to the school year, but rather, in the case of a coach, extend to extra curricular activities. Just as a policeman is the legal authority figure for adults, a teacher represents the first authority figure to young children." (Brief of Appellee, No. 88–1619, p. 8). If the "extra curricular" activity had a real "nexus" to the duties and obligations owing by Epps to School District, we would agree with plaintiffs. However, such is simply not the case. Here, the plaintiffs voluntarily participated with Epps in basketball camp fundraising activities which were not related to school activities, and thus, not undertaken under color of state law.

The School District could be held liable in this case under § 1983 only if plaintiffs demonstrated a *direct causal connection* between the hiring, investigative, and supervising policy in question and the alleged constitutional deprivation. *City of Canton, Ohio v. Harris,* —— U.S. ——, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989) ("Moreover, for liability to attach in this circumstance the identified deficiency in the city's [police] training program [policy] must be *closely related to the ultimate injury.* Thus, in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs." 109 S.Ct. at 1206.) (emphasis supplied).

In *Springfield v. Kibbe,* 480 U.S. 257, 267, 268, 107 S.Ct. 1114, 1120, 94 L.Ed.2d 293 (1987) (O'Connor, J., dissenting) observed:

Given the importance, under § 1983, of distinguishing between direct and vicarious liability, the Court repeatedly has stressed the need to find a direct causal connection between municipal conduct and the constitutional deprivation. See *e.g., Oklahoma City v. Tuttle,* 471 U.S. [808] at 824–25, n. 8 [105 S.Ct. 2427, 2436 n. 8, 85 L.Ed.2d 791] (requiring 'affirmative link' between municipal policy and constitutional violation); *Polk County v. Dodson,* 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (municipal policy must be the 'moving force' behind constitutional deprivation).... When the execution of municipal policy does not compel a constitutional violation, however, the causal connection between municipal policy and the deprivation of constitutional rights becomes more difficult to discern. In some sense, of course, almost any injury inflicted by a municipal agent or employee ultimately can be traced to municipal policy.

Where a claim is based on the Due Process Clause of the Fourteenth Amendment (as here), the Supreme Court has held that such does not transform every tort committed by a state actor into a constitutional violation. *Daniels v. Williams,* 474 U.S. 327, 335–36, 106 S.Ct. 662, 667, 88 L.Ed.2d 662 (1986) ("Jailers may owe a special duty of care to those in their custody under state tort law, see Restatement (Second) of Torts § 314A(4) (1965), but for the reasons previously stated we reject the contention that the Due Process Clause of the Fourteenth Amendment embraces such a tort law concept."); *Martinez v. California,* 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980) ("Her life was taken by the parolee five months after his release ... the parole board was not aware that appellants' decedent, as distinguished from the public at large, faced any special danger ... we do hold that at least under the particular circumstances of this parole decision, appellants' decedent's death is too remote a consequence of the parole officers' action to hold them responsible under the federal civil rights law."); *Baker v. McCollan,* 443 U.S. 137, 146, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979) (holding that the tort

of false imprisonment does not become a violation of the Due Process Clause of the Fourteenth Amendment simply because the defendant is a state official and that "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law."); *Paul v. Davis*, 424 U.S. 693, 701, 96 S.Ct. 1155, 1160, 47 L.Ed.2d 405 (1976) ("Rather, he apparently believes that the Fourteenth Amendment's Due Process Clause should *ex proprio vigore* extend to him a right to be free of injury whenever the state may be characterized as the tortfeasor. But such a reading would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the states.").

In *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986), the Supreme Court observed that the touchstone for determining "official policy" is by distinguishing "acts of the municipality from acts of employees of the municipality, and thereby making clear that municipal liability is limited to action for which the municipality is actually responsible." And *Pembaur* makes it clear that the policy must be a deliberate choice of action *"with respect to the subject matter in question." Id.* at 483–84, 106 S.Ct. at 1300. (Emphasis supplied). The subject matter "in question" in the instant case is the alleged deprivation of constitutional rights of the plaintiffs (rights of liberty and privacy) which occurred June 13–14, 1984.

In *City of St. Louis v. Praprotnik*[1], *supra*, a plurality of the Supreme Court held that a municipality cannot be liable under § 1983 unless the final policy maker, as identified by statute (in our case Dr. Clayton or Dr. Clayton and Principal Dan-

iels) is the one who takes the unconstitutional action. In the instant case, there can be no question but that the "unconstitutional action" charged against the defendants were the coerced acts of sexual molestation practiced upon the plaintiffs by Epps on June 13–14, 1984, alleged by plaintiffs to have resulted by virtue of the School District's willful disregard or deliberate indifference to the plaintiffs evidenced in its policy of hiring, investigation, and supervision of Epps, which plaintiff's pleaded to have established "[a] causal connection between the acts of Epps and the conduct of District." (R., Supp.Vol. I, Tab 1, Complaint, p. 7). Like the Supreme Court holding in *Martinez v. California*, *supra*, we hold that the acts of molestation practiced by Epps upon the plaintiffs on June 13–14, 1984, constituted too remote a consequence of the 1981 hiring and investigation policy to impose liability upon the School District under the civil rights law.

In *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720 (3rd Cir.1989), the court held that a former female high school student who had been sexually abused and forced to engage in various sexual acts during her entire high school years and thereafter by the band director of the school, some of which acts occurred in the band room and on trips for band functions, could maintain a 42 U.S.C. § 1983 civil rights action against the school district and certain of its officials for damages. The court distinguished *Stoneking* from *DeShaney v. Winnebago County Department of Social Services*, — U.S. —, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) in one significant aspect, i.e., "[T]he principal distinction between DeShaney's situation and that of Stoneking is that DeShaney's injuries resulted at the hands of a private actor, whereas Stoneking's resulted from

---

1. In *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (plurality opinion), the Supreme Court held that the trial court must identify those officials who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the alleged constitutional deprivation or violation. Once the court has identified those officials who have the authority to make official policy decisions, it is then the

duty of the jury to determine whether those policy decisions caused the deprivation of constitutional rights. In the case at bar, the district court, without the benefit of *Praprotnik*, permitted the jury to make both findings/determinations. This was error. However, no objections were lodged and, in our view, the error was harmless because the court specially instructed that Dr. Clayton and Principal Daniels were acting under color of state law.

the actions of a state employee." *Id.* at 724.

The Court was careful to point out that the band director was a school district employee subject to its control during the performance of his official duties and that "[m]any of Wright's interactions with Stoneking occurred in the course of his performance of his official responsibilities, such as during school-sponsored events and trips, and sometimes on school property." *Id.* Liability of the school district was claimed by reason of "[t]heir own actions in adopting and maintaining a practice, custom or policy of reckless indifference to instances of known or suspected sexual abuse of students by teachers, in concealing complaints of abuse, and in discouraging students' complaints about such conduct." *Id.* at 724–25. The evidence supported these contentions.

Between 1978 and 1982, the principal and assistant principal in *Stoneking* had received at least five complaints about sexual assaults of female students by teachers and staff members which were repressed and concealed. On that foundation, the court held that it is for a jury to determine whether there was a causal relationship between the school district's practices, customs or policies and the repeated sexual assaults in the case. The court affirmed the district court's denial of a motion for summary judgment filed by the school principal and assistant principal. Significantly, however, the court reversed the district court's denial of a motion for qualified immunity filed by Frederick Shuey, the superintendent of the school district:

> [W]e must conclude, in light of our precedent, that Stoneking's claims against Shuey amount to mere "inaction and insensitivity" on his part.... We cannot discern from the record any affirmative acts by Shuey on which Stoneking can base a claim of toleration, condonation or encouragement of sexual harassment by teachers which occurred in one of the various schools within his district.

*Id.* at 731.

Comparing the facts of the case at bar with *Stoneking* leads to the inescapable conclusion that for purposes of liability there is no comparison. In *Stoneking*, the court had no difficulty determining that the sexual acts practiced by the band director during school hours and on school business were those of a state actor. Such cannot be said of Epps' status when he practiced the child molestation charged in our case. Furthermore, there is no evidence that Dr. Clayton or Principal Daniels ever concealed or attempted to coverup any child abuse actions against school children. Nor is there any evidence that either were ever aware of any child molestation acts committed by Epps (beyond the report from Mrs. Kelley) or other sexual improprieties on Epps' part until the June 13–14, 1984, incidents, which occurred away from school property and in relation to an activity unrelated to school sponsorship. It is significant that the *Stoneking* court found, for causation purposes, that the school district policy had to relate specifically to toleration, condonation or encouragement of sexual harassment.

Our case is much more akin factually to those actions brought under 42 U.S.C. § 1983 involving acts of an off-duty police officer during private employment as a security guard. However, even this comparison is tenuous because in our case Epps did not, on June 13–14, 1984, perform any duties or functions as a teacher or coach and he was completely free of any and all contractual obligations to the School District.

In *Travers v. Meshriy*, 627 F.2d 934 (9th Cir.1980), the court affirmed a judgment awarding damages to a bank customer who brought a 42 U.S.C. § 1983 action against the bank and its employees alleging false imprisonment, assault, slander, and intentional infliction of emotional distress resulting from his detention by an off-duty policeman employed by the bank. The court held that there was sufficient state involvement in Officer Gibson's actions to render them "under color of state law:"

> [G]ibson himself testified that he responded to Meshriy's [a bank supervisor] call as a police officer rather than as a bank employee. Furthermore, it was es-

tablished at trial that using off-duty police officers as "security tellers" at the bank was part of a police department "secondary hiring" program, and that the police department selected the officers for the program. An officer who had been instrumental in establishing the program testified that if an officer believed a crime had been committed, or was directed by a bank officer to stop an individual, his or her primary duty was to the department, not to the bank. Gibson flashed his police identification at Traver, moreover, and introduced himself as a police officer before instructing Traver to sit down on the platform. All these indicia of state action compel the conclusion that Gibson was acting "under color of state law" when he responded to Meshriy's call for help.

*Id.* at 938.

We observe that none of the indicia set forth in *Travers v. Meshriy* leading to the conclusion that there was sufficient state involvement to render Officer Gibson's actions as taken under "color of state law" apply in the instant case. To the contrary, there is no evidence showing that the School District lent any sponsorship or encouragement to the actions taken by Epps on June 13–14, 1984, to enlist the plaintiffs in an effort to raise money for summer basketball camp. As such, Epps could not have been considered to be acting as a teacher or basketball coach because the incident occurred during his summer vacation from any school duties.

In *Robinson v. Davis,* 447 F.2d 753 (4th Cir.), *cert. denied,* 405 U.S. 979, 92 S.Ct. 1204, 31 L.Ed.2d 254 (1972), some part-time town police officers and part-time campus security officers were held not to have acted under "color of state law" for 42 U.S.C. § 1983 purposes when they requested that students attend a college administrative hearing because, although wearing their official police uniforms, the plaintiffs-students summoned by the security officers were cognizant that those individuals were fellow students acting as security officers. Insofar as the municipality was concerned, the court held that "[T]he elements of control over, involvement in and

direct responsibility for the actions of the private party [the security officers] present in *Burton* [*Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961)] are lacking here." *Id.* at 757–58.

In *Watkins v. Oaklawn Jockey Club,* 183 F.2d 440 (8th Cir.1950), the court held that an off-duty sheriff and his deputy did not act under color of state law for purposes of maintaining an action of false arrest and imprisonment under 42 U.S.C. § 1983 when the deputy, upon orders of the president of the race track and the sheriff, ejected the plaintiff from the track. The court deemed it significant that the deputy did not arrest the plaintiff and that he simply stated to the plaintiff that he was to be ejected, thereupon escorting him to the gate. The court placed particular emphasis on the fact that the sheriff and the deputy were acting only in the ambit of their personal pursuits and that they were not performing any duty imposed upon them by the state.

In *Crowder v. Jackson,* 527 F.Supp. 1004 (W.D.Pa.1981), the court held that plaintiff's 42 U.S.C. § 1983 claim against a municipality must fail where plaintiff was allegedly beaten by an off-duty policeman working as a security guard at a grocery store. The complaint alleged that the municipality allowed its policeman to "moonlight" in uniform as security officers and that it failed to properly train them. The court cited to *Rizzo v. Goode,* 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976) where the court observed that plaintiff had failed to show "an affirmative link between the occurrence of the various incidents of police misconduct and the adoption of any plan or policy—express or otherwise—showing their authorization or approval of such misconduct." 423 U.S. at 371, 96 S.Ct. at 604. The court held:

> Plaintiff's naked allegations regarding the Borough's failure to train its employees, and permitting its police officers to "moonlight" are insufficient since there is no foundation for the required showing that the Borough authorized, approved, or was indifferent to Mr. Jack-

son's action. The plaintiff's theory of municipal liability under section 1983, therefore must fail.

527 F.Supp. at 1006.

We hold that the district court erred, as a matter of law, in submitting the issue of School District's liability to plaintiffs under 42 U.S.C. § 1983 for the child molestation acts committed by Epps on June 13–14, 1984. We hold that there was no state action involved when the plaintiffs were molested by Epps; Epps was not acting under color of state law when he molested the plaintiffs; the policy or custom of School District relative to its procedure in the investigation, hiring and supervision of teachers was not the "moving force" behind the alleged deprivation of plaintiffs' constitutionally protected rights; and the district court erred in failing to grant School District's motion for a directed verdict at the close of all of the evidence, or in the alternative, in denying School District's motion for judgment notwithstanding the verdict. In so holding, we have viewed the evidence and all reasonable inferences therefrom in the light most favorable to the plaintiffs. *See Richardson v. City of Albuquerque*, 857 F.2d 727, 731 (10th Cir. 1988).

### II.

█ School District argues that the district court erred in submitting to the jury the issue whether the School District's policy or custom—i.e., its established procedure in investigating, hiring and supervision of teacher—constituted deliberate indifference to or reckless disregard for the rights of the plaintiffs and, if so, whether such policy was the moving force behind a constitutional deprivation. We agree.

In *Oklahoma City v. Tuttle*, 471 U.S. 808, 824 n. 7, 105 S.Ct. 2427, 2436 n. 7, 85 L.Ed.2d 791 (1985), the Supreme Court observed that "[i]t is an open question whether a policymaker's 'gross negligence' in establishing police training practices could establish a 'policy' that constitutes a 'moving force' behind subsequent unconstitutional conduct, or whether a more conscious decision on the part of the policymaker would be required." Even so, the

Court repeated the necessity of finding a direct causal connection between the municipal conduct (policy) and the constitutional deprivation. *Id.* at 824–25, n. 8, 105 S.Ct. at 2436, n. 8 (requiring an "affirmative link.") *See also Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (policy must be the "moving force" behind the constitutional deprivation).

In *City of Canton, Ohio v. Harris, supra*, the Supreme Court held that municipal liability under § 1983 attaches where city policy makers elect deliberately to follow a course of action from among various alternatives (there, a training program for its police officers) which is so inadequate that the policymakers acted deliberately indifferent to a specific need leading to the violation of constitutional rights. Furthermore, the Court spoke of the nexus between the condemned "policy" and the ultimate injury, i.e., that the policy must actually cause the alleged injury:

> Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury, thus in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs....
>
> *   *   *   *   *   *
>
> To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983 ... [and which would permit] ... cases against cities for their 'failure to train' employees to go forward under § 1983 on a lesser standard of fault [which] would result in *de facto respondeat superior* liability on municipalities—a result we rejected in *Monell*, 4 36 U.S. at 693–94, 98 S.Ct. at 2037 ... claims ... alleging that the city's failure to provide training to municipal employees ... can only yield liability against a municipality where the city's failure to train reflects *deliberate indifference to the constitutional rights of its inhabitants.*

109 S.Ct. at pp. 1206–07.

Under the standard of negligence mandated by *City of Canton, Ohio v. Harris,*

*supra,* i.e., that a consciously adopted "policy" (here the established procedure of the School District in the investigation, hiring and supervision of teachers) must, in a causal sense, reflect deliberate indifference to the constitutional rights of plaintiffs, we must hold that the evidence in this case is simply insufficient to demonstrate that the School District's policy reflected a reckless disregard or deliberate indifference to the alleged constitutional rights of the plaintiffs violated by Epps on June 13–14, 1984. It is by hindsight that the need to make inquiries of law enforcement agencies concerning an applicant's felony record rather than relying on the fact that a teacher convicted of a felony is not entitled to have a teaching certificate in the State of Oklahoma seems clear. Nothing done or undone by Dr. Clayton or Principal Daniels, however, could give rise to deliberate indifference to the constitutional rights of the plaintiffs. "If the mere exercise of discretion by an employee could give rise to a constitutional violation, the result would be indistinguishable from *respondeat superior.*" *City of St. Louis v. Praprotnik,* 485 U.S. at 126, 108 S.Ct. at 925.

This court has applied the "deliberate indifference" standard in many civil rights cases, although sometimes positing it in terms of reckless disregard or gross negligence. In all cases, we have applied a much more stringent test than ordinary negligence. In *Garcia v. Salt Lake County,* 768 F.2d 303 (10th Cir.1985), we applied the "deliberate indifference" test in a 42 U.S.C. § 1983 action brought against Salt Lake County and certain of its officials, on a claim that its official policies, practices and customs were deliberately indifferent to serious medical needs of persons confined in the county jail before conviction and were violative of the Eighth Amendment. We there held that:

> Deliberate indifference to serious medical needs may be shown by proving there are such gross deficiencies in staffing, facilities, equipment, or procedures that the inmate is effectively denied access to adequate medical care. *See Ramos v. Lamm,* 639 F.2d 559, 575 (10th

Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981)....

*Id.* at 308.

See also: *Ware v. Unified School District 492, Butler County, Kansas,* 881 F.2d 906 (10th Cir.1989) (In § 1983 action in which it was alleged that a school district's secretary was terminated because she exercised constitutionally protected speech, held that a direct causal link must be demonstrated between acts of the governing body and the alleged constitutional deprivation and that the governing body exercised its decision-making authority with deliberate indifference to the protected constitutional rights); *Starrett v. Wadley,* 876 F.2d 808 (10th Cir.1989) (In a Title VII and § 1983 sexual harassment case, held that Wadley, the former county assessor, was the final policy maker in regard to the termination of plaintiff Starrett; however, by contrast, held that Wadley's acts of sexual harassment, separate from the firing, did not constitute official policy, and, on that basis, the district court erred in denying the county's motion for judgment n.o.v.); *Specht v. Jensen,* 863 F.2d 700 (10th Cir.1988) (Where city was sued in a § 1983 action for damages resulting from alleged illegal search of a home and office based on failure to supervise or train police officers, held that there was no evidence tending to show deliberate indifference); *Blankenship v. Meachum,* 840 F.2d 741 (10th Cir.1988) (Federal inmate brought § 1983 suit alleging that prison officials placed him in the general prison population, resulting in attacks by an unknown inmate and serious injuries; held that to rise to level of Eighth Amendment violation, failure of prison officials to protect inmates must be wanton, not inadvertent or error in good faith); *Meade v. Grubbs,* 841 F.2d 1512 (10th Cir.1988) (Municipality may be held liable under § 1983 for excessive use of force by police officers where there is essentially complete failure to train, or training so reckless or grossly negligent that future misconduct is almost inevitable).

In reviewing a denial of a motion for judgment notwithstanding the verdict, such denial is error "[o]nly when the evidence

points but one way and is susceptible to no reasonable inferences sustaining the position of the party against whom the motion is made." *Cooper v. Asplundh Tree Expert Co.*, 836 F.2d 1544, 1547 (10th Cir. 1988). And our review of a denial of a motion for a new trial focuses on whether the "[v]erdict is clearly, decidedly, or overwhelmingly against the weight of the evidence." *Champion Home Builders v. Shumate*, 388 F.2d 806, 808 (10th Cir.1967).

We hold that, as a matter of law, the evidence in the case at hand was insufficient to establish that the School District's policy of investigating, hiring and supervising teachers was so wanting that it constituted deliberate indifference or reckless disregard for the constitutional rights of the plaintiffs. The district court erred in denying the School District's motion for directed verdict at the close of all of the evidence, or, in the alternative, in denying School District's motion for judgment notwithstanding the verdict.

We REVERSE.